**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAHARA EL** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **vs.** | : | **NO.  17-2345** |
| | : | |
| **ADVANCE STORES COMPANY, INC.** | : | |
| **d/b/a ADVANCE AUTO PARTS** | : | |

**KEARNEY, J.**                                                            **December 27, 2017**

## MEMORANDUM

We expect supervisors treat the company employees with the same disciplined respect regardless of their race, gender or disability.  If discovery confirms disputes of material facts, we require our juries evaluate whether the challenged workplace conduct fails to meet these standards.   We today review competing fact records arising from an African American woman store manager's claim her white supervisor discriminated and retaliated against her including through a text message threatening "kill black bitches" and, in other contexts, describing her as part of the "apes" working for their company.  When she complained after months of allegedly harassing supervisor conduct, the same supervisor rejected the employer's requirement to apologize and instead told her she was not good enough to work for him.   Shortly thereafter, the employer fired her for employee discount purchases occurring over eleven months earlier. Upon being sued, the employer claims it fired her for violating company policy on employee discounts. But the employer never used this policy to discipline an employee before it fired Ms. El.  We reviewed disputed or inconsistent facts and explanations for why the manager lost her job.  In the accompanying Order, we require our jury evaluate the credibility of the manager's race and gender discrimination and hostile work environment claims but dismiss the disability claims.

## I.     Facts in the light most favorable to Ms. El.

Advance Auto Parts hired Tahara El, an African American woman, as a part time salesperson in Georgia in 2002.[1]  After two years, Ms. El transferred to Philadelphia to become an inventory specialist and later, a "commercial parts pro."[2]  Advance later promoted Ms. El to assistant general manager of its Upper Darby, Pennsylvania store.[3]

### A.     Advance promotes Ms. El to general manager.

Advance's Upper Darby store worked through a high turnover in general managers requiring Ms. El to "basically" run the store.[4]  Ms. El asked to be promoted to general manager several times but Advance denied her as "not ready."[5]  In 2008, Advance promoted Ms. El to general manager telling her "we should have made this decision a long time ago."[6]

Michael Slaboda, a Caucasian man, initially supervised Ms. El as a district manager.[7]  Mr. Slaboda harassed Ms. El based on her gender and race until Advance terminated his employment for harassing another employee.[8]  As a result of Mr. Slaboda's harassment, Ms. El experienced anxiety and her doctor diagnosed her with anxiety and depression.[9]  Ms. El told Advance's Human Resources Manager Mark Woodring she needed time off from work because of her anxiety and depression.[10]  She does not recall how he responded to her request, but she did take sick leave for her depression and anxiety.[11]

### B.     Renewed problems when Chris McElrane becomes district manager.

After Advance fired Mr. Slaboda, Ms. El had a different district manager until late 2014 when Advance named Chris McErlane, a Caucasian male, as Ms. El's district manager.[12]  "As soon as [Mr. McErlane] took over, he started giving [Ms. El] a hard time."[13]

Mr. McErlane did not allow Ms. El to distribute raises to her store employees although male general managers controlled this distribution to their store employees.[14]  Ms. El requested this same control over her employees' raises and more control over her store generally from Mr.

McErlane several times.[15]  Mr. McErlane responded to Ms. El's requests by telling her it does not matter because she would not be with Advance long.[16]  When Ms. El asked him what he meant he would "just smirk and laugh."[17]

From the time Mr. McErlane became Ms. El's district manager, he would come to her store on a bi-weekly basis and speak down to her and move items in her store around.[18]  Mr. McErlane visited Ms. El's store more often than he visited other stores in his district and visited more often than Ms. El's previous district managers.[19]  He would ignore her except when downgrading or cursing at her because he did not believe she did her job the right way.[20]  For example, employee Jermaine Alexander witnessed Mr. McErlane kick a watercooler saying, "[t]his is some bullshit.  I'm dealing with a lot of, you know, apes."[21]

Mr. McErlane told her women should not be in superior positions like management and she did not deserve the salary Advance paid her.[22]  Mr. McErlane denies saying this.[23]  Renee Harris, an African-American female, worked as a commercial accounts manager with Advance.[24]  Ms. Harris also believed Mr. McErlane discriminated against her based on her gender and race.[25]  At some point, Mr. McErlane told Ms. Harris he wanted Ms. El fired because of her store's appearance and lack of motivation from her team members.[26]  Ms. Harris warned Ms. El Mr. McElrane was "coming for her" because, "[h]e don't want none of the African American women in management positions at all."[27]

On December 14, 2014, one of Ms. El's sons had an unexpected seizure and Ms. El took three to four days off from work to care for her son.[28]  Mr. McErlane approved Ms. El taking these three to four days off from her accrued sick leave to care for her son.[29]  Her son's doctors discovered a lesion in his brain causing the seizures and they needed to perform surgery to remove it.[30]  Ms. El requested sick time for her son's surgery from Mr. McErlane.[31]  When Ms.

El returned to work after the surgery, Mr. McErlane asked Ms. El "was it worth staying out those couple of days."[32]  Ms. El then occasionally needed to leave early for her son's medical needs and Mr. McErlane would allow her "but [she] had to hear the wrath of it."[33]  Sometimes he made her work extra days because he had let her leave early to take care of her son although she had 240 hours of accrued sick time.[34]  Mr. McErlane's comments about Ms. El taking time off to care for her son made her scared to take more time because she "knew he was gunning for [her]."[35]

In April 2015, Mr. McErlane referred to his general managers (both genders and Caucasian and African American), including Ms. El, as a "bunch of donkeys" during a conference call.[36]  Mr. McErlane agreed he used the word donkeys but denied meaning it as a racial slur.[37]  In June 2015, Mr. McErlane told Ms. El she and the employees of her Upper Darby store were "acting like a park apes" and used "the word black bitches in the store."[38]  Mr. McErlane denies these statements.[39]  Mr. McErlane threatened to have a man named Justin "run tracks up and down" Ms. El.[40]  Mr. McErlane would also text Ms. El late at night, past 10:30 P.M., about work issues.[41]

Ms. El spoke with Mike Molnar, Advance's regional vice president and Mr. McErlane's supervisor about Mr. McErlane's sexist and racist conduct towards her.[42]  Mr. McErlane retaliated when he learned of her report to Mr. Molnar.  On July 24, 2015, Ms. El called Advance's ethics hotline to report Mr. McErlane's "disrespectful and demeaning" conduct towards her after he discovered her conversation with Mr. Molnar.[43]  Ms. El also stated when Mr. McErlane learned Ms. El reported her assistant general manager appeared intoxicated at the store to Mr. Molnar, Mr. McErlane threatened to write her up and berated her for speaking to Mr. Molnar.[44]  She also told the ethics hotline Mr. McErlane stated "you're making just as much money as I am a year, but you're not earning it" and she would be out of a job within the year.[45]

Ms. El also reported a few days after Mr. McErlane berated her for speaking with Mr. Molnar, Mr. McErlane demanded Ms. El work on a day she previously scheduled off even though Ms. El told Mr. McErlane she needed to time off to care for her son's medical needs.[46]

After Ms. El's call to the ethics hotline, Mr. Molnar and Mr. Woodring met with her and she described Mr. McErlane's harassment.[47] Mr. Woodring and Mr. Molnar denied Ms. El's request to transfer to a different store and instead, Mr. McErlane remained her supervisor.[48] Ms. El also requested permission to hire her own assistant general manager like other general managers and they denied her request.[49] About a week after the meeting, Mr. Molnar and Mr. Woodring directed Mr. McErlane to apologize to Ms. El. Instead of apologizing, Mr. McErlane told her, "I'm not here to apologize, but it was told to me to come and apologize…I still don't think you deserve this job."[50]

In August 2015, Mr. McErlane sent Ms. El a text message saying "kill black bitches."[51] Mr. McErlane denies sending this text.[52] Mr. McErlane also sent a text message with the word "killer" to a Caucasian female employee.[53] In this same time frame, Mr. McErlane required Ms. El to come into work while she was on vacation to write up an employee for a violation.[54] Ms. El believed he forced her to come as a show of authority to her because she was African-American and a woman.[55] Mr. McErlane also called Ms. El once or twice late at night "breathing heavily into the phone" and Ms. El believed he was intoxicated.[56]

### C. Advance investigates and terminates Ms. El's employment.

On February 2, 2016, Advance's Asset Protection Manager, Paul Kofmehl, investigated another employee's unfounded allegation Ms. El allegedly improperly purchased a reservoir bottle.[57] Mr. Kofmehl then asked Ms. El about her purchase of a transmission on March 3, 2015- almost a year earlier.[58] Ms. El explained she needed a transmission for her car, but her Advance

store did not have a transmission in stock.[59]  Ms. El purchased it from a second source vendor through Advance, the same method Advance employees use when a customer requests an item not stocked in the store.[60]

When an Advance employee purchases a second source item for a customer, they pay the vendor at cost and then mark the price up by 20% when they sell it to the customer.[61]  Ms. El purchased a transmission from a second source vendor for $1,800 through Advance and paid Advance $1,800 plus tax when she purchased it for herself.[62]  She did not mark the transmission up an additional 20% as she would if she sold the transmission to a customer.[63]

Ms. El believed she could make this purchase under Advance's employee discount program which allows employees to take 20% off regularly priced items in Advance stores.[64]  Ms. El explained her interpretation to Mr. Kofmehl and Mr. McErlane, and Mr. McErlane remained silent while Mr. Kofmehl agreed with her interpretation if you work for Advance you pay cost for second source items.[65]  Mr. Kofmehl told Mr. McErlane to leave Ms. El alone and she returned to work.[66]  During this interview, Ms. El signed a statement stating she purchased a transmission from a second source vendor on March 3, 2015 and "the cost of the transmission was [$]1800 and I paid [$]1800 for it because I paid retail for it because I work for the company at Advance."[67]

The next day, Ms. El visited her doctor for the stress caused by her working environment. Her doctor approved Ms. El for medical leave starting February 3, 2016, because of her depression and anxiety.[68]  Ms. El took a week of medical leave and returned to work on February 11, 2016.[69]  At the start of her medical leave on February 3, 2016, Ms. El complained to Mr. Woodring about Mr. McErlane requiring her to come in and work on her scheduled off time when the store had been closed the previous Saturday because of a snowstorm and sales were

low.[70]  Ms. El contacted other general managers supervised by Mr. McErlane with low sales and asked them if they were required to work on their days off to make up sales.  They did not have to come to work.[71]

Ms. El took a week of medical leave then returned to work.  Less than a week after returning from leave, on February 17, 2016, Mr. Woodring and Mr. McErlane terminated Ms. El's employment with Advance for violating the employee discount policy with her March 3, 2015 transmission purchase (almost a year earlier).[72]  Advance replaced Ms. El with an African-American male as general manager.

Before Ms. El, Advance has never terminated a person's employment for purchasing second source items at cost for his or herself.  Advance did not discipline Ms. Harris, an African-American female commercial accounts manager who purchased second source items at cost.[73]  Mr. McErlane did not supervise Ms. Harris and it is unknown who conducted the investigation, if any.  Advance also did not terminate Jermaine Alexander, an African-American male employee, who also purchased a second source item at cost.[74]  At the time, Mr. Alexander was a commercial parts pro and Mr. Kofmehl and Mr. Shultz investigated the second source purchase.[75]  Mr. Kofmehl dropped the investigation and did not terminate or discipline Mr. Alexander.[76]  Advance also did not terminate Joshua Branch, an African-American male who worked as a commercial parts pro, who purchased a second source item at cost then sold it below cost to a customer.[77]  It is unknown who supervised or investigated Mr. Branch's second source purchase.[78]  A male employee also purchased a second source item at cost and Advance did not terminate his employment.[79]  The employee's race, job title, supervisor, and whether anyone investigated him is unknown.[80]  At this stage, the evidence shows Mr. McErlane is the only Advance supervisor to terminate an employee for this conduct.   He terminated Ms. El, an

African American woman general manager, when Advance did not terminate other employees with similar conduct.

## II.    Analysis

Ms. El sued Advance alleging gender discrimination, retaliation, and hostile work environment under Title VII.  Ms. El also alleges race discrimination under § 1981 and disability discrimination under the American with Disabilities Act ("ADA").   Advance moves for summary judgment on Ms. El's claims arguing Ms. El does not adduce evidence Advance discriminated or retaliated against her on the basis of her gender, race, or disability.[81]

### A.    Ms. El adduces evidence of gender discrimination.

Ms. El alleges Advance discriminated against her on the basis of gender because Advance terminated her employment for violating the employee discount policy but did not terminate men who violated the same policy.  Under the *McDonnell Douglas* framework, Ms. El must adduce evidence "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse employment action gives rise to an inference of unlawful discrimination."[82]   We use the *McDonnell Douglas* framework in the absence of direct evidence of discriminatory animus, to shift through indirect evidence to determine if Advance's termination of Ms. El is motivated by discriminatory animus.[83]   We can deal with the first three elements quickly as Ms. El is a woman, qualified for her position, and suffered an adverse employment action because Advance terminated her employment.

We focus on the fourth element of the *prima facie* case to determine whether Ms. El adduced evidence to support an inference of gender discrimination.  Ms. El can meet this element by adducing evidence "similarly situated persons outside the protected class were treated

more favorably" or other evidence establishing "some causal nexus between … membership in a protected class and the [adverse action]."[84]  Ms. El's similarly situated burden is usually satisfied with a showing "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."[85]  Our similarly-situated analysis focuses on specific case to determine what facts and circumstances are relevant to the analysis.[86]

Ms. El adduces evidence of one comparator, Mr. Alexander, for her gender discrimination claim.  The basis for Ms. El's termination, the employee discount policy, applied to all comparators.  Only Mr. Alexander and Ms. El were investigated by the same person, Mr. Kofmehl, under the same employee discount policy.  While Mr. Alexander held a less senior job than Ms. El, in context, this distinction is not important because the employee discount policy applies to both positions with no distinction in the policy based on their positions.  Viewing the evidence in the light most favorable to Ms. El, she adduces evidence Advance treated a male employee more favorably because Mr. Kofmehl investigated Mr. Alexander, a male, for a second source purchase at cost and did not terminate his employment, when Mr. Kofmehl terminated Ms. El's employment for the same conduct.

Having shown a *prima facie* case, the burden now shifts to Advance to articulate a legitimate, nondiscriminatory reason for terminating Ms. El's employment.[87]  Advance satisfies this burden arguing Ms. El's purchase of the second source transmission at cost violated the employee discount policy because Ms. El should have paid an additional 20% purchase price under the policy.

The burden now shifts back to Ms. El to adduce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Advance's] proffered legitimate reasons" to show discriminatory animus based on gender is really the motivating factor for Advance terminating her employment.[88] Ms. El adduces evidence Advance only terminated her employment for purchasing a second source item at cost. Ms. El also adduced evidence different supervisors at Advance disagreed how the employee discount policy applies to second source items. Mr. Schultz, a district manager, believed employees could purchase second source items at cost under the policy, while Mr. McErlane believed employees needed to mark second source items up an additional 20% under the same policy.[89]

Ms. El adduced evidence Mr. Kofmehl treated a similarly situated employee outside her protected class differently because Mr. Kofmehl investigated Mr. Alexander, a man, for the same conduct and did not discipline him. Ms. El also adduces evidence Mr. Kofmehl did not believe Ms. El committed a violation of the employee discount policy and told Mr. McErlane to leave her alone after his investigation. Viewing the evidence in the light most favorable to Ms. El, she adduced sufficient evidence for the jury to find inconsistencies and implausibilities in Advance's legitimate, nondiscriminatory reason to terminate Ms. El's employment for violating the employee discount policy. We deny Advance's motion for summary judgment on Ms. El's gender discrimination claim.

**B.      Ms. El adduces evidence of race discrimination.**

Ms. El alleges Advance discriminated against her on the basis of her race under § 1981 in terminating her employment. As with Ms. El's gender discrimination claim, we apply the *McDonnell Douglas* framework. Ms. El is an African-American, qualified for her position, and suffered an adverse employment action because Advance terminated her employment.[90]

Ms. El can adduce evidence to support an inference of discriminatory animus through evidence "similarly situated persons outside the protected class were treated more favorably" or other evidence establishing "some causal nexus between … membership in a protected class and the [adverse action]."[91]   Ms. El adduces evidence of a causal connection between her membership in a protected class and her termination based on evidence of Mr. McErlane's alleged use of racially charged phrases "apes", "park apes", "donkeys", and "black bitches" towards Ms. El and other African-American employees.  Mr. McErlane also allegedly sent Ms. El a text with phrase "kill black bitches" shortly after she complained about his conduct to Advance and instead of apologizing, he told Ms. El, "I'm not here to apologize, but I was told to me to come and apologize…I still don't think you deserve this job."[92]  While Ms. El does not adduce "similarly situated persons outside the protected class were treated more favorably" because she only adduces evidence of African-American comparators, there is evidence Mr. McErlane terminated Ms. El's employment based on his discriminatory animus towards African-Americans.

Having shown a *prima facie* case, the burden now shifts to Advance to articulate a legitimate, nondiscriminatory reason for terminating Ms. El's employment.[93]  Advance again satisfies this burden arguing Ms. El's purchase of the second source transmission at cost violated the employee discount policy because Ms. El should have paid an additional 20% purchase price under the policy.

The burden now shifts back to Ms. El to adduce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Advance's] proffered legitimate reasons" to show discriminatory animus is really the motivating factor for Advance terminating her employment.[94]  As with her gender discrimination claim, Ms. El adduces

evidence of one comparator, Mr. Alexander, also African-American. Mr. Kofmehl investigated both Mr. Alexander and Ms. El and treated Mr. Alexander more favorably but a crucial difference is Mr. Alexander had a different district manager at the time, Mr. Schultz.[95] When Mr. Kofmehl investigated Ms. El, he worked with Mr. McErlane, who allegedly used racially charged phrases towards Ms. El and wanted her fired. Ms. El also testified Mr. Kofmehl did not believe Ms. El violated the employee discount policy and told Mr. McErlane to leave her alone after his investigation further suggesting inconsistencies in Advance's legitimate, non-discriminatory reason for terminating her employment. Ms. El also adduces evidence Advance only terminated her employment for purchasing a second source item at cost and different supervisors at Advance disagreed how the employee discount policy applies to second source items.[96]

Viewing the evidence in the light most favorable to Ms. El, she adduced sufficient evidence for the jury to find inconsistencies and implausibilities in Advance's legitimate, nondiscriminatory reason to terminate Ms. El's employment for violating the employee discount policy and find Mr. McErlane's discriminatory animus is truly the motivating factor. Mr. McErlane denies saying or sending these racially charged phrases to Ms. El. We deny Advance's motion for summary judgment on Ms. El's race discrimination claim because there are genuine issues of material fact whether Mr. McErlane had discriminatory animus based on race for the jury to resolve. Mr. McErlane's alleged racial slurs including "apes", "kill black bitches" and possibly "donkeys" taint his decision to later fire Ms. El for conduct occurring almost a year earlier even without evidence of a direct comparator Caucasian not being fired for the same discount purchase. The test is discriminatory animus towards Ms. El based on her race

and, given these facts, we cannot be certain of no genuine issues of material fact regarding Mr. McErlane's allegedly race-based motivations for firing Ms. El.

### C. Ms. El adduces evidence of a hostile work environment based on gender and race.

Ms. El alleges Mr. McErlane subjected her to a hostile work environment based on her gender and race and Advance knew of Mr. McErlane's conduct. To proceed, Ms. El must adduce evidence: (1) Mr. McErlane intentionally discriminated against her based on her gender or race; (2) Mr. McErlane's discrimination was severe or pervasive; (3) the discrimination detrimentally affected Ms. El; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of <u>respondeat superior</u> liability."[97] "Severe or persuasive" requires evidence Mr. McErlane's discrimination "alter[ed] the conditions of [Ms. El's] employment and create[d] an abusive working environment."[98] We look "at all the circumstances, including the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [Ms. El's] work performance."[99]

For the first element—intentional discrimination based on her gender—Ms. El adduces evidence Mr. McErlane told her women should not be in superior positions like management and she did not deserve the salary Advance paid her.[100] Mr. McErlane also allegedly sent Ms. El a text message with the phrase "kill black bitches."[101] Mr. McErlane denies saying this or sending a text saying "kill black bitches." For intentional discrimination based on her race, Ms. El adduced evidence Mr. McErlane called her and other employees "park apes" and used the phrase "ape" and "black bitches" and used the phrase "donkeys" on conference calls with his general managers including multiple races and genders.[102] Mr. McErlane also allegedly sent a text threatening "kill black bitches."[103] Mr. McErlane denies using any racially charges phrases but

does not deny using the word donkeys but he does not believe it has any racial meaning. Viewing the evidence in a light most favorable to Ms. El, she adduces evidence Mr. McErlane intentionally discriminated against her on the basis of her race and gender.

For the second element, Mr. McErlane's intentional discrimination must be severe or pervasive. To be severe or pervasive, the discrimination must be more than "[s]imple teasing, offhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim."[104] For gender discrimination, Ms. El alleges a serious isolated incident of intentional gender discrimination. Ms. El alleges Mr. McErlane sent her a text threatening "kill black bitches" and Mr. McErlane denies he sent this text. If sent, this text evidences animus which a jury could find equates to gender discrimination because bitches is a derogatory term for women and it is also "severe" because it threatens fatal physical violence against black women, including Ms. El, who received the text. Mr. McErlane's conduct in sending this text is also severe because he sent it shortly after she complained about his harassment, he retaliated, and she complained about his retaliation to Advance's ethics hotline and instead of apologizing to her as Advance requested, Mr. McErlane said, "I'm not here to apologize, but it was told to me to come and apologize…I still don't think you deserve this job."[105] Viewing this evidence in a light most favorable to Ms. El, she adduced sufficient evidence of animus for the jury, if believed, to find Mr. McErlane's discriminatory and violence threatening text message to be severe enough to create a hostile work environment based on gender.

For race discrimination, Mr. McErlane's "kill black bitches" text is also similarly severe in nature because it specifies violence against African-American women. Ms. El also adduced evidence Mr. McErlane allegedly used racially charged phrases calling her and other African-

American employees "park apes" and used the phrase "ape" and "black bitches" and used the phrase "donkeys" to a mixed group of employees.[106]   Viewing this evidence in a light most favorable to Ms. El, she adduced sufficient evidence for the jury to find Mr. McErlane's use of racially charged and violent language towards her, as her supervisor, is severe enough to create a hostile work environment based on race.

For the third element, Ms. El must adduce evidence Mr. McErlane's discrimination detrimentally affected her.   Ms. El testified she did not show Mr. Woodring or other supervisors at Advance the "kill back bitches" text because she was "scared" and felt the corporate office would not do anything.[107]   Ms. El testified the stress of the harassment and hostile work environment exacerbated her anxiety and depression to the point she required medical leave.[108] Ms. El also testified she did not want to take time off because Mr. McErlane "was gunning for her" and affecting her home life.[109]   This evidence is sufficient.

For the fourth element, we determine whether Mr. McErlane's discrimination would detrimentally affect a reasonable person in Ms. El's circumstances.   Any reasonable person, let alone an African American woman, would be affected by Mr. McErlane's alleged "kill black bitches" text message because it threatens fatal physical violence.   A reasonable person would be even more affected by this violent threatening text message if it occurred after she reported her supervisor's harassment to her superior, her superior berated her for reporting his harassment, she called the ethics hotline to report her supervisor retaliated against her for reporting his harassment, and then after human resources directed her supervisor to apologize, he instead told her he refused to apologize and she did not deserve her job.   Additionally, throughout this time, Mr. McErlane continued to use other racially charged insults towards her and her employees while harassing and belittling her bi-weekly.   The fifth element, respondent superior, is satisfied

because Mr. McErlane supervised Ms. El so the jury could find Advance is directly liable for his conduct.[110]

We deny summary judgment on Ms. El's hostile work environment claim based on gender and race due to genuine disputes of material fact whether Mr. McErlane said the intentionally discriminatory phrases.

### D. Ms. El adduces evidence of Title VII retaliation.

Ms. El alleges Advance retaliated against her for complaining about Mr. McErlane's discriminatory conduct by terminating her employment. A Title VII retaliation claim requires Ms. El adduce evidence "(1) she engaged in activity protected by Title VII; (2) [Advance] took an adverse employment action against her; and, (3) there was a causal connection between her participation in the protected activity and the adverse employment action."[111]

Ms. El adduces a *prima facie* case because she engaged in protected activity when she called Advance's ethics hotline and reported Mr. McErlane discriminated against her on the basis of her gender and race. Ms. El also suffered an adverse employment action because Advance terminated her employment.

Ms. El can show a causal connection where a close temporal proximity between the protected activity and adverse employment action is "unusually suggestive."[112] Where the temporal proximity is greater, Ms. El can show a causal connection through "the circumstances as a whole, including any intervening antagonism by the employer, inconsistences in the reasons the employer gives for its adverse action, and any other evidence suggesting that [Advance] had a retaliatory animus when taking the adverse action."[113] While approximately six months pass between Ms. El's protected activity and termination lessening the "unusually suggestive" temporal proximity, the circumstances and inconsistencies surrounding her termination suggest

Mr. McErlane acted with retaliatory animus. Mr. McErlane already retaliated against Ms. El in July 2015 when he threatened to write her up and berated her after he discovered she reported his conduct towards her to Mr. Molnar.[114] Ms. El then reported Mr. McErlane's retaliation a few days later and Advance made Mr. McErlane apologize but he told Ms. El he did not truly apologize and still believed she should be fired. Ms. El also adduced evidence Mr. McErlane told another Advance employee he wanted to terminate Ms. El's employment.[115]

In February 2016, Mr. Kofmehl and Mr. McErlane investigated Ms. El for March 2015 conduct and Mr. Kofmehl agreed with Ms. El's belief her conduct did not violate Advance's policies and told Mr. McErlane to leave Ms. El alone.[116] A few days later in February 2016, Ms. El again complained about Mr. McErlane's discriminatory conduct, and a few days later Advance terminated her employment for a March 3, 2015 purchase (almost a year earlier). Ms. El adduced evidence she is the only employee terminated for violating the employee discount policy by purchasing a second source items, although Advance knew other employees committed the same infraction. Viewing this evidence in light most favorable to Ms. El, she adduces sufficient evidence for the jury to find a causal connection between her protected activity and Advance terminating her employment.

As in Ms. El's gender and race discrimination claims, the next two steps of the *McDonnell Douglas* framework are the same. Advance satisfies its burden of a legitimate, nondiscriminatory reason for Ms. El's termination because Ms. El purchased a second source transmission at cost allegedly violating its employee discount policy because Ms. El should have paid an additional 20% purchase price under the policy.[117]

Ms. El also satisfies her burden to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Advance's] proffered legitimate reasons" because she

adduces evidence Advance then terminated one person's, Ms. El, employment for purchasing a second source item at cost, different supervisors at Advance disagreed how the employee discount policy applies to second source items, Mr. Kofmehl investigated Mr. Alexander for the same conduct and did not discipline him, and Mr. Kofmehl did not believe Ms. El violated the employee discount policy and told Mr. McErlane to leave her alone after his investigation. Viewing the evidence in the light most favorable to Ms. El, she sufficiently adduced evidence for the jury to find inconsistencies and implausibilities in Advance's legitimate, nondiscriminatory reasons to terminate Ms. El's employment for violating the employee discount policy.[118]  We deny Advance's motion for summary judgment on Ms. El's Title VII retaliation claim.

### E.      Ms. El does not adduce evidence of disability discrimination.

Ms. El alleges Advance discriminated against her based on her disability and her son's disability in violation of the Americans with Disabilities Act.  In her responding brief, Ms. El argues Advance discriminated against her based on her disability but does not address discrimination based on her son's disability.  We assume Ms. El abandoned a claim based on her son's disability and narrowed her argument to Advance terminated her employment because of her disability, anxiety and depression.[119]

To prove Advance discriminated against Ms. El based on her disability, Ms. El must adduce evidence "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise able to perform the essential functions of the job, with or without reasonable accommodations by the employer; and, (3) [she] suffered an otherwise adverse employment decision as a result of discrimination."[120]  To be a "qualified individual with a disability", Ms. El adduce evidence "she has mental impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded as having such an impairment."[121]

Ms. El argues her depression and anxiety "substantially affected her ability to tolerate stress normally and substantially affected her ability to work for [Advance]."[122]  Ms. El argues she has a record of this impairment based on her 2009 and 2016 requests for medical leave.  At this stage, giving all reasonable inferences to Ms. El, she adduced evidence for the jury to find she is a qualified individual with a disability who could otherwise perform the duties of her job and she suffered an adverse employment action.

Ms. El must then adduce a causal connection between her request for reasonable accommodation for her disability—medical leave—and Advance's adverse employment action.[123]  While Ms. El can establish a causal connection with temporal proximity, here, Advance terminated her employment less than a week after her medical leave, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred."[124]  Ms. El argues, "[b]ased on [Mr.] McErlane's negative statements…including harassing her on/around February 3, 2016 when she told him she needed time off, a reasonable factfinder could determine that he fired her based on having to miss work due to her disability."[125]  Ms. El offers no cite for these alleged February 2016 harassing statements, and after close review of the record, we cannot find testimony Mr. McErlane made a negative comment about Ms. El's February 2016 medical leave.  Ms. El simply offers no evidence to support a finding Mr. McErlane had a retaliatory motive based on her disability besides mere timing.  The dearth of testimony from Ms. El on her disability is key because Ms. El offers extensive testimony on Mr. McErlane's comments and conduct over eighteen months to support her gender and retaliation claims.  We cannot infer a causal link based solely on temporal proximity where Ms. El does not offer testimony of a retaliatory motive to support our inference a causal link between her taking medical leave and the termination.[126]

## III.     Conclusion

We deny Advance summary judgment on Ms. El's gender and race discrimination, Title VII retaliation, hostile work environment based on gender and race, and Ms. El's Pennsylvania Human Relations Act claims based on gender, race, and retaliation for the same reasons as her federal claims.  We grant Advance summary judgment on Ms. El's ADA discrimination claims and her Pennsylvania Human Relations Act disability claim because Ms. El fails to adduce sufficient evidence of a genuine dispute of material fact relating to her disability claim.[127]

---

[1] Appendix, p. 10 (hereafter "A-0010".)  We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Ms. El, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits.  Advance filed its Statement of Undisputed Material Facts and Appendix at ECF Doc. No. 19. Ms. El responded to Advance's Statement of Undisputed Facts and filed its Statement of Undisputed Material Facts and Appendix at ECF Doc. No. 30-36. Advance responded to Ms. El's Statement of Undisputed Facts and added exhibits to the Appendix at ECF Doc. No. 38.

[2] A-0010.

[3] *Id.*

[4] A-0012

[5] *Id.*

[6] *Id.*

[7] A-0040.

[8] A-0041, A-0046.

[9] A-0050.

[10] *Id.*

[11] *Id.*

[12] A-0055.

[13] *Id.*

[14] A-0024.

[15] A-0025.

[16] *Id.*

[17] *Id.*

[18] A-0032.

[19] A-0033.

[20] *Id.*

[21] A-0173.

[22] A-0043.

[23] A-1025.

[24] A-0192.

[25] A-0198-99.

[26] A-0199.

[27] A-0103.

[28] A-0057.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] A-0058.

[34] A-0058.

[35] *Id.*

[36] A-0108-109.

[37] *Id.*

[38] A-0098, A-0064.

[39] A-0127.

[40] A-0064.

[41] A-0066.

[42] A-0063.

[43] A-0241.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] A-0065.

[48] A-0068.

[49] A-0072.

[50] A-0065.

[51] A-0067.

[52] A-0127.

[53] A-0075.

[54] A-0076.

[55] *Id.*

[56] A-0098.

[57] A-0086.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] A-0089.

[62] *Id.*

[63] *Id.*

[64] A-0037-38.

[65] A-0087.

[66] *Id.*

[67] A-0089.

[68] A-0091.

[69] A-0090-91.

[70] A-0081-82.

[71] A-0084.

[72] A-0090.

[73] A-0088-89.

[74] A-0088.

[75] A-0027-28.

[76] A-0028.

[77] A-0094.

[78] *Id.*

79 A-0088.

80 *Id.*

81 Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

82 *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa. 2017) (quoting *Tourtellotte v. Eli Lilly & Co.*, 636 Fed. Appx. 831, 842 (3d Cir. 2016)).

83 *See Mason v. Southeastern Pennsylvania Transportation Authority*, 134 F. Supp. 3d 868, 873 (E.D. Pa. 2015) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999)) ("In the absence of direct evidence that the employer's decision was motivated by discriminatory animus, a plaintiff may produce evidence that creates the inference of discrimination").

84 *Lamb v. Montgomery Township*, No. 15-6759, 2016 WL 7426125 at *11 (E.D. Pa. Dec. 23. 2016) (*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003)).

85 *Collins*, 247 F. Supp. 3d at 589 (quoting *Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 222-23 (3d Cir. 2009)).

86 *See id.* (citing *Houston v. Easton Area School District*, 355 Fed. Appx. 651, 654 (3d Cir. 2009) and *Hobson v. St. Luke's Hosp. & health Network*, 735 F. Supp. 2d 206, 214 (E.D. Pa. 2010)).

87 *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *McDonnell Douglas*, 411 U.S. at 802).

88 *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Fuentes*, 32 F.3d at 674).

[89] A-0182, A-0112.

[90] *See Collins*, 247 F. Supp. 3d at 588 (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267 (3d Cir. 2010) (An employee's race discrimination claims under § 1981 are analyzed under the *McDonnell Douglas* framework).

[91] *Lamb*, 2016 WL 7426125 at *11 (*Sarullo*, 352 F.3d at 798).

[92] A-0065.

[93] *See Fuentes*, 32 F.3d at 763 (citing *McDonnell Douglas*, 411 U.S. at 802).

[94] *Willis*, 808 F.3d at 644 (citing *Fuentes*, 32 F.3d at 674).

[95] A-0182, A-0112.

[96] A-0182, A-0112.

[97] *Moody v. Atlantic Board of Education*, 870 F.3d 206, 213 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

[98] *Id.* at 214 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[99] *Id.* (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

[100] A-0043.

[101] A-0067.

[102] A-0043, A-0098.

[103] A-0067.

[104] *Davis v. Southeastern Pennsylvania Transportation Authority*, No. 13-6864, 2016 WL 97922 at *8 (E.D. Pa. Jan. 8, 2016).

[105] A-0065.

[106] A-0043, A-0098.

[107] A-0067.

[108] A-0091.

[109] A-0058.

[110] *See Larochelle v. Wilmac Corporation*, 210 F. Supp. 3d 658, 682 (E.D. Pa. 2016) (quoting *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009)) ("In cases where the alleged sexual harassment is done by a co-worker (not a supervisor) liability only attaches if the employer 'failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action'")

[111] *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

[112] *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015).

[113] *Id.* (internal citations omitted).

[114] A-0241.

[115] A-0199.

[116] A-0087.

[117] *See Fuentes*, 32 F.3d at 763 (citing *McDonnell Douglas*, 411 U.S. at 802).

[118] *Willis*, 808 F.3d at 644 (citing *Fuentes*, 32 F.3d at 674).

[119] Under the amendments to the Americans with Disabilities Act, Advance may also discriminate against Ms. El based on the "known disability of an individual with whom the qualified individual is known to have a relationship or association." *See* 42 U.S.C. § 2112(b)(4); *see also Tyson v. Access Services*, 158 F. Supp. 3d 309, 314 (E.D. Pa. 2016) (citing *Pollere v. USIG Pa., Inc.*, 136 F. Supp. 3d 680, 685 (E.D. Pa. 2015) and *Barthalow v. David H. Martin Excavating. Inc.*, No. 05-2593, 2007 WL 2207897 at *3 (E.D. Pa. July 30, 2007)). Ms. El, however, adduced no evidence she suffered an adverse employment action casually connected to taking time off for her son's medical leave. Ms. El testified Mr. McErlane approved all time off she needed, and although he may have made insensitive comments, he did not subject her to an adverse employment action at that time because he terminated her employment over a year after her son's disability.

[120] *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (quoting *Gaunt v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998)).

[121] *Id.* (citing 42 U.S.C. § 12102(2)).

[122] ECF Doc. No. 29 at 23.

[123] *See Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004) (internal citations omitted).

[124] *Proudfood v. Arnold Logistics, LLC*, 629 Fed. Appx. 303, 308 (3d Cir. 2015) (quoting *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 332 (3d Cir. 2015)).

[125] ECF Doc. No. 29 at 24.

[126] *See Proudfood*, 629 Fed. Appx. at 308 (quoting *Jones*, 796 F.3d at 332).

[127] *See Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (analyzing plaintiff's Title VII and PHRA employment discrimination claims together); *Williams*, 380 F.3d at 761 n.6 (internal citations omitted) (analyzing plaintiff's ADA and PHRA disability claims together).